In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3834

DAVID SCHEPERS, *et al.*,

*Plaintiffs-Appellants*,

*v.*

COMMISSIONER, INDIANA DEPARTMENT OF CORRECTION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:09-cv-1324 TWP-TAB—**Tanya Walton Pratt**, *Judge.*

ARGUED MAY 25, 2012—DECIDED AUGUST 28, 2012

Before POSNER, FLAUM, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Indiana, like many states, main-
tains a public database of persons convicted of sex of-
fenses. Its database is called the "Sex and Violent Offender
Registry" and is accessible via the Internet. See Indiana
Sex and Violent Offender Registry, http://www.
icrimewatch.net/indiana.php (last visited August 23, 2012).
People visiting the registry's website find, on each regis-
trant's page, a recent photograph, home address, informa-

tion about the registrant's height, weight, age, race, and sex, and information about the particular offenses that required placement on the registry. Some registrants' pages may additionally carry the label of "sexually violent predator," if they have committed certain serious offenses or have had multiple previous convictions for specified sex and violent offenses. See IND. CODE § 35-38-1-7.5 (defining "sexually violent predator"). The public can search the database by a variety of fields (such as offender name or county of residence), and can generate a map showing the location of all registered offenders living near any address (such as one's home or school).

A class of persons required to register brought this suit against the Indiana Department of Correction (DOC), alleging that the DOC's failure to provide any procedure to correct errors in the registry violates due process. In response, the DOC created a new policy to give notice to current prisoners about their pending registry listings and an opportunity to challenge the information. The district court granted summary judgment on the ground that the new policy was sufficient to comply with due process. But the DOC's new procedures still fail to provide *any* process at all for an entire class of registrants—those who are not incarcerated. We thus reverse the district court's grant of summary judgment and remand for further proceedings.

## I

Indiana's registry was enacted in 1994; it was modeled on New Jersey's "Megan's Law," the country's first sex

offender registration statute. Many states have created similar registries since then, spurred no doubt by Congress's threat of withholding grant money from states that did not. See generally *Wallace v. State*, 905 N.E.2d 371, 374 (Ind. 2009) (discussing the history of Indiana's registry and the impact of the 1994 Jacob Wetterling Crimes Against Children and Sexually Violent Offenders Registration Act). Over time, Indiana's registry has greatly expanded in scope, in terms of both who is required to register and what registration entails.

Today, a conviction for any of 21 different offenses, including some non-sex offenses such as murder, voluntary manslaughter, and kidnapping, requires an offender to be listed on the registry. See IND. CODE § 11-8-8-5. Placement on the registry comes with a variety of obligations and restrictions; failure to comply can have criminal consequences. Among other obligations, a registrant must periodically report in person to the local law enforcement authority—for most, annually, and for sexually violent predators, every 90 days—to update contact information and take a new photograph. *Id.* § 11-8-8-14. Failure to do so is a felony. *Id.* § 11-8-8-17. Registrants must also allow law enforcement to visit and verify their addresses (again annually for most and every 90 days for sexually violent predators). *Id.* § 11-8-8-13. Registrants must carry a valid driver's license or state identification card at all times, or risk prosecution, *id.* § 11-8-8-15; they are forbidden from changing their names, *id.* § 11-8-8-16.

The status of being a "sexually violent predator" carries with it extra burdens. In addition to their obligation to

register more frequently, sexually violent predators are regulated in other ways: they cannot live, work, or volunteer within 1,000 feet of a school, public park, or youth program center. To do so is a felony. *Id.* § 35-42-4-10; 35-42-4-11(c); see also Alex Campbell, *Motel Home to City's Largest Sex Offender Cluster*, INDIANAPOLIS STAR, Feb. 18, 2012, *available at* http://blogs.indystar.com/ starwatch/2012/02/18/motel-home-to-citys-largest-sex-offender-cluster/; Jeff Wiehe, *Sex-felon Residency Law Vexes Everyone*, FORT WAYNE J. GAZETTE, Jan. 8, 2012, *available at* http://www.journalgazette.net/article/ 20120108/LOCAL/301089926/-1/LOCAL11. In addition, if a sexually violent predator plans to be absent from her home for more than 72 hours, she must inform local law enforcement in both the county where she lives and the county she plans to visit of her travel plans. IND. CODE § 11-8-8-18.

## II

David Schepers is one of an estimated 24,000 registrants on Indiana's Sex and Violent Offender Registry. (This number comes from data collected in February 2010, at which time the registry contained 24,000 registrants, some of whose obligations to keep their data current had expired, and 11,000 of whom were under a current obligation to comply with these rules.) Schepers must register because he was convicted of two counts of child exploitation in 2006. If one were to visit Schepers's registry profile today, she would see those two counts along with the designation "Offender

Against Children." But for some time in the past, Schepers was erroneously designated as a "Sexually Violent Predator" and thus was subject to the more burdensome requirements and restrictions that apply to that group. (There is no dispute that Schepers is not a Sexually Violent Predator under Indiana law.) He tried to correct this error, but he found that the DOC provided no official channel or administrative mechanism allowing him to do so. He turned to informal channels, telephoning officials in the DOC in an attempt to get the label removed. When that proved unsuccessful, he brought suit against the DOC under 42 U.S.C. § 1983 on behalf of a class of registrants, arguing that the DOC's failure to provide any mechanism to correct registry errors violated due process and seeking injunctive relief to establish such a procedure.

In response to the suit, the DOC instituted a new policy designed to provide some process to correct registry errors. It calls that policy the "Sex and Violent Offender Registry Appeal Process." Under the new Appeal Process, the DOC must send prisoners notice (consisting of two forms—a "notice" and a "specimen") before they are released from their institution that explains what information will be published on the registry. The notice informs the prisoner that if there are any errors with his information, he has 20 days to seek review by submitting an appeal to the director of the Division of Registration and Victim Services. The person deciding the appeal (the "Appeal Authority") can then request additional information or consult with the prisoner. The policy does *not* require the Appeal Authority

to hold a hearing, formal or otherwise. After 30 days have passed, all appeals are "deemed denied." If an appeal is not deemed denied, the prisoner will be notified of a decision to grant an appeal in full or in part. The prisoner has no right to further review after an appeals decision. As we indicated earlier, this Appeal Process applies only to those who are incarcerated in DOC facilities; it does not apply to persons listed on the registry who already have been released or were never incarcerated in a DOC facility (perhaps because they received a probationary sentence or they were convicted in another state).

After enacting this new policy, the DOC moved for summary judgment on the basis that the policy was sufficient to meet the requirements of due process. In addition, it argued that the Due Process Clause did not apply at all because mistakes in the registry do not infringe any constitutionally protected liberty interest. The district court rejected the DOC's argument that the Due Process Clause did not apply, holding that misclassification of registrants does implicate an offender's liberty interest and is thus protected by the Due Process Clause. But the court agreed with the DOC that its new appeals policy was sufficient to meet the Clause's requirements, and granted summary judgment. Plaintiffs now appeal.

## III

We review the grant of a motion for summary judgment *de novo*, construing all facts and drawing all infer-

ences in the light most favorable to the non-moving party (here, Schepers and the plaintiff class). *Lagestee-Mulder, Inc. v. Consolidated Ins. Co.*, 682 F.3d 1054, 1056 (7th Cir. 2012). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

We begin by addressing a preliminary argument raised by the DOC unrelated to the merits of the due process question. The DOC contends that it cannot be the entity required to provide process, even if process is due, because (it says) it is not the entity responsible for mistakes in the sex offender registry. Put briefly, the DOC argues that Schepers has sued the wrong defendant. The DOC stresses that it "does not publish any information on the Internet" and "does not control the sex offender registry web site." Instead, those tasks are currently performed by the Indiana Sheriff's Association. But the DOC does not and cannot contest that, under state law, it is the entity ultimately responsible for the creation, publication, and maintenance of the registry. See IND. CODE § 11-8-2-12.4 ("The department shall . . . Maintain the Indiana sex and violent offender registry."); *id.* § 11-8-2-13(b) (listing the DOC's registry responsibilities, including requirements that it "[e]nsure that the Indiana sex and violent offender registry is updated at least once per day with information provided by a local law enforcement authority" and "[p]ublish the Indiana sex and violent offender registry on the Internet"). DOC's argument begins to unravel when one discovers that the reason why the Indiana Sheriff's Association is the entity that publishes information on the Internet is because the DOC has

contracted with it to do so. We will accept for present purposes that state law also gives the sheriffs some shared responsibility over the registry, see *id.* § 36-2-13-5.5, but this does not diminish the DOC's own state-law obligations. (Perhaps the DOC could have argued that the sheriffs were necessary parties to this suit. We doubt that this defense would have been successful, but no matter: The DOC never raised it and it has thus been waived. See FED. R. CIV. P. 12(h)(2); *Mucha v. King*, 792 F.2d 602, 613 (7th Cir. 1986).)

Moreover, the facts in the record do not support the DOC's attempt to put so much distance between itself and the day-to-day operation of the registry. It appears that the DOC does have a direct role to play in some of the errors that creep into registry listings. The DOC is the entity that first decides how offenders should be classified and what information will appear in the registry. It then passes that information on to the Sheriff's Association for publication. Clearly, errors can crop up at any of these stages, but surely one of the most important points is the stage at which the DOC makes an initial registry determination. Thus, under state law and in practice, the DOC has sufficient responsibility over the registry to be compelled to provide any additional process that may be required.

## IV

### A

That brings us to the heart of the due process claim in this case. Plaintiffs allege that errors in the regis-

try—such as being mislabeled a sexually violent preda-tor—infringe on a liberty interest protected by the Due Process Clause, and thus that the DOC is required to provide some process to correct those errors. In order for state action that injures one's reputation to implicate the Due Process Clause, the action must also alter one's legal status or rights. The Supreme Court applied this principle to allegations of defamation by government agents in *Paul v. Davis*, 424 U.S. 693 (1976), where it rejected the argument that the injury to reputation from being included on a list of "active shop-lifters" implicated a liberty interest for due process pur-poses. Rather, the Court held, it is the alteration of legal status, in the sense of a deprivation of a right previously held under state law, that when "combined with the injury resulting from the defamation, justif[ies] the invocation of procedural safeguards." *Id.* at 708-09; see also *Kahn v. Bland*, 630 F.3d 519, 534 (7th Cir. 2010) (applying this test). The need to show alteration of legal status along with some stigmatic or reputation injury is commonly referred to as the "'stigma plus' test." *Kahn*, 630 F.3d at 534.

The district court held that the class members meet both parts of the "stigma plus" test. The DOC does not challenge that holding on appeal, and so any argument on this issue is therefore forfeited. It did argue before the district court, however, that the plaintiffs had failed to assert a liberty interest; since this case is being re-manded, we think it prudent to discuss the matter briefly. The plaintiff class here is complaining about much more than the kind of simple reputational

interest asserted by respondent Davis in the Supreme Court's case. The Indiana statute deprives members of the class of a variety of rights and privileges held by ordinary Indiana citizens, in a manner closely analogous to the deprivations imposed on parolees or persons on supervisory release. Citizens do not need to report to the police periodically, nor is their right to travel conditioned on notifications to the police in both the home and the destination jurisdiction. Unlike Schepers, who was forbidden from living within 1,000 feet of a school or park while he was categorized as a sexually violent predator, members of the public are free to decide where they wish to live. These restrictions, in our view, fit the requirement in *Paul v. Davis* of an alteration in legal status that takes the form of a deprivation of rights under state law.

Although any kind of placement on the sex offender registry is stigmatizing, we agree with the district court that erroneous labeling as a sexually violent predator is "further stigmatizing to [one's] reputation." Society's abhorrence of sexually violent predators goes above and beyond that reserved for other sex offenders. Indiana has taken that position formally through the additional restrictions in the law on the sexually violent predator's actions. Other courts have reached similar conclusions when considering sex offender registration systems with "tiered" registration levels. See, *e.g.*, *Pasqua v. Council*, 892 A.2d 663, 675 (N.J. 2006), abrogated on other grounds by *Turner v. Rogers*, 131 S. Ct. 2507 (2011); *New York v. David W.*, 733 N.E.2d 206, 210-11 (N.Y. 2000). We are satisfied that plaintiffs have shown that

the kind of registry mistakes they have alleged here implicate a liberty interest protected by the Due Process Clause.

B

This leaves the question whether Indiana is providing whatever process is "due." To answer that question, we must balance three factors: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The DOC argues that the process it currently provides adequately balances these three factors and thus passes muster under the Due Process Clause. But there is a glaring problem with this position: it ignores the fact that the policy provides *no process* whatsoever to an entire class of registrants—those who are not incarcerated. If it were impossible to land on the registry without a prior term of incarceration, then this might be a different case, at least moving forward; those persons who had been released before this system was enacted would still be out of luck. But that is not the way it works. The record leaves no doubt that not all registrants are first incarcerated, even though many of

the crimes triggering registration are quite serious. More-over, even for people who move from an Indiana prison onto the registry and thus obtain whatever benefits DOC's procedures offer, there is no guarantee that later mistakes will not be made (perhaps, for instance, when someone moves from one town to another, or a sheriff's department changes computer systems). A cursory review of some of the pages on the registry itself reveals that registrants are sometimes given sentences that are suspended, sentences of proba-tion, or sentences with terms so low (several months) that they receive credit for time served and never move to a DOC facility.

The DOC complains again that it makes no sense for it to be the entity responsible for furnishing notice and review to people who are not located in its institu-tions. That, however, is what the Indiana legislature decided to do, when it gave DOC control over the entire registry, including both those who entered it from prison and those who did not. See IND. CODE § 11-8-2-12.4(5) (requiring the DOC to maintain records for sex and violent offenders who are not necessarily incarcerated). It is not our role to question the wisdom of the state's choice in this respect. Taking the system as it is, we conclude that the DOC's current procedures are inadequate because they fail to provide any way for persons not currently incarcerated, including the lead plaintiff in this case, to correct errors in the registry.

This deficiency alone requires us to reverse the district court's grant of summary judgment. We are

also concerned, however, with the fact that the DOC's appeals process never actually requires the DOC to review a registrant's complaint. Under the 30-day "deemed denied" policy, an appeal never has to be considered before it is rejected. An offender could mail his appeal to the DOC appeal authority, only to have it sit on a desk unread. Such an appeal would be deemed denied after 30 days of inaction. This is not sufficient to meet the "fundamental requirement of due process"—"the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). An appeal process must at the very least provide for a real opportunity for registrants to bring errors to the DOC's attention and, if the arguments have merit, to have the errors fixed.

The DOC finally argues that it is not under any legal compulsion to provide process to registrants (even though it is currently doing so voluntarily for some) because adequate state judicial remedies exist to correct any errors. It is true that in some circumstances, a deprivation of liberty or property might be the result of a "random and unauthorized" act by a state official, and the aggrieved person is thus relegated to post-deprivation remedies such as state tort actions. See, *e.g.*, *Parratt v. Taylor*, 451 U.S. 527, 543 (1981). But as we have explained, the *Parratt* doctrine "rest[s] on the principle that when a state officer acts in a 'random and unauthorized' way—by unpredictably departing from state law, for example—the state has *no opportunity* to provide a pre-deprivation hearing and may instead satisfy due

process by providing an adequate post-deprivation remedy." *Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, 589 F.3d 865, 872 (7th Cir. 2009) (emphasis added). Where, however, the state has an opportunity to provide pre-deprivation process because the deprivation is the "result of some established state procedure," the *Parratt* doctrine does not apply. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982). Like the Indiana Court of Appeals, we see the determination of registry status as "analogous to an established state procedure, rather than a random and unauthorized act of a state official." *Myers v. Coats*, 966 N.E.2d 652, 659 (Ind. App. Ct. 2012). The DOC uses established procedures to determine a person's registry status, in light of his criminal history and the registry definitions under state law, and then it publishes that information on the registry website. Before publication, an additional procedural step that provides an opportunity to check the accuracy of that information can easily be incorporated into the established processes, in order to reduce the frequency of any mistakes that happen to arise.

We agree with the plaintiffs that the state judicial post-deprivation remedies cited by the DOC are insufficient to meet the requirements of due process. First, many of the remedies to which the DOC points are not available to registrants challenging errors like those at issue here. See IND. CODE § 11-8-8-22 (available only to persons seeking a change in registration status based on changes in registration laws after June 30, 2007); IND. CODE § 35-38-1-7.5(g) (giving state courts discretionary power to change sexually violent predator status after 10 years).

And although a writ of mandate under IND. CODE § 34-27-3-1 appears to be theoretically available, its usage is disfavored in Indiana law. See *Zimmerman v. Indiana*, 750 N.E.2d 337, 340 (Ind. 2001) (Rucker, J., concurring) ("Mandate is an extraordinary remedy viewed with extreme disfavor."). The DOC gives no example of a registrant using a writ of mandate to challenge a registry listing in Indiana. Finally, although registrants can, and have, challenged registry errors in the course of criminal prosecutions for failure to comply with registration requirements, due process does not require a person to risk additional criminal conviction as the price of correcting an erroneous listing, especially where a simple procedural fix is available much earlier.

At this stage, we decline to outline in any more detail what sort of process the DOC must enact. Instead we leave it open for the parties to determine in further proceedings (or, of course, the court, should the parties fail to agree on a constitutionally adequate result). We note in this connection that due process is "flexible and calls for such procedural protections as the particular situation demands." *Dupuy v. Samuels*, 397 F.3d 493, 504 (7th Cir. 2005) (quoting *Mathews*, 424 U.S. at 334). It is possible that a paper review system would suffice, given the fact that registration requirements are not discretionary. We also do not prejudge whether or to what extent additional process would be required at each re-registration event, assuming that the person's registration status has not changed. If there are reasons to provide additional process at re-registration stages, or there is no available judicial review of the DOC's denial of an appeal, the parties or the court will need

to consider whether DOC must provide somewhat more extensive process. See *Dupuy*, 397 F.3d at 504 ("As long as substantial post-deprivation process is available, the pre-deprivation process . . . need not be elaborate or extensive. Rather, in many situations, it should be an initial check against mistaken decisions.").

We conclude with the observation that providing additional procedures to correct registry errors may wind up benefitting the state as well as registrants. Erroneously labeling an offender a sexually violent predator imposes unnecessary monitoring costs on state law enforcement and reduces the efficacy of the registry in providing accurate information to the public. See *Indiana Sex Offender Registry Full of Inaccuracies*, EVANSVILLE COURIER & PRESS, Apr. 21, 2012, *available at* http://www. courierpress.com/news/2012/apr/21/indiana-sex-offender-registry-full-inaccuracies/ (quoting the "director of legislative affairs at the National Center for Missing & Exploited Children" calling the errors "troubling" because "[t]he value of the public registry as a child protection tool is that the information is accurate"). Reducing these errors is in the interest of the state as well as the plaintiffs.

* * *

On remand, we encourage the parties to work together to come to an agreement that fits within the boundaries outlined above. As it stands, the DOC's process is constitutionally insufficient. We thus REVERSE the district court's grant of summary judgment and REMAND for further proceedings consistent with this opinion.