**AUTOCEPHALOUS GREEK–ORTHO- DOX CHURCH OF CYPRUS and The Republic of Cyprus, Plaintiffs–Appellees,**

v.

**GOLDBERG AND FELDMAN FINE ARTS, INC., and Peg Goldberg, Defendants–Appellants.**

No. 89–2809.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 16, 1990.

Decided Oct. 24, 1990.

Rehearing and Rehearing En Banc Denied Nov. 21, 1990.

O'er that which hath been, and o'er that which must be:

What we have seen, our sons shall see; Remnants of things that have pass'd away,

Fragments of stone, rear'd by creatures of clay!

from *The Siege of Corinth*, George Gordon (Lord Byron)[1]

Byron, writing here of the Turkish invasion of Corinth in 1715, could as well have been describing the many churches and monuments that today lie in ruins on Cyprus, a small, war-torn island in the eastern corner of the Mediterranean Sea. In this appeal, we consider the fate of several tangible victims of Cyprus' turbulent history: specifically, four Byzantine mosaics created over 1400 years ago. The district court awarded possession of these extremely valuable mosaics to plaintiff-appellee, the Autocephalous Greek–Orthodox Church of Cyprus ("Church of Cyprus" or "Church"). *Autocephalous Greek–Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc.*, 717 F.Supp. 1374 (S.D.Ind.1989). Defendants-appellants, Peg Goldberg and Goldberg & Feldman Fine Arts, Inc. (collectively "Goldberg"), claim that in so doing, the court committed various reversible errors. We affirm.

John D. Hoover, Sally F. Zweig, Johnson, Smith, Densborn, Wright & Heath, Indianapolis, Ind., Thomas R. Kline, and Thomas E. Starnes, Andrews & Kurth, Washington, D.C., for plaintiffs-appellees.

Joseph H. Yeager, Jr., Joe C. Emerson, Baker & Daniels; Phillip A. Terry, Brian K. Peters, McHale, Cook & Welch; and Ezra H. Friedlander, Friedlander & Kirsh, Indianapolis, Ind., for defendants-appellants.

Before BAUER, Chief Judge, and CUDAHY, Circuit Judge, and PELL, Senior Circuit Judge.

BAUER, Chief Judge.

There is a temple in ruin stands, Fashion'd by long forgotten hands; Two or three columns, and many a stone, Marble and granite, with grass o'ergrown!

Out upon Time! it will leave no more Of the things to come than the things before!

Out upon Time! who for ever will leave But enough of the past and the future to grieve

## I. Background

In the early sixth century, A.D., a large mosaic was affixed to the apse of the Church of the Panagia Kanakaria ("Kanakaria Church") in the village of Lythrankomi, Cyprus. The mosaic, made of small bits of colored glass, depicted Jesus Christ as a young boy in the lap of his mother, the Virgin Mary, who was seated on a throne. Jesus and Mary were attended by two archangels and surrounded by a frieze depicting the twelve apostles. The mosaic was displayed in the Kanakaria Church for centuries, where it became, under the practices of Eastern Orthodox Christianity, sanctified as a holy relic. It survived both the vicissitudes of history, *see Autocephalous*, 717 F.Supp. at 1377 (discussing the period of Iconoclasm during which many religious

1. *Reprinted in The Complete Poetical Works of* Byron 384–96 (Cambridge ed. 1933).

artifacts were destroyed), and, thanks to restoration efforts, the ravages of time.[2]

Testimony before Judge Noland established that the Kanakaria mosaic was one of only a handful of such holy Byzantine relics to survive into the twentieth century. Sadly, however, war came to Cyprus in the 1970s, from which the mosaic could not be spared.

The Cypriot people have long been a divided people, approximately three-fourths being of Greek descent and Greek–Orthodox faith, the other quarter of Turkish descent and Muslim faith.[3] No sooner had Cyprus gained independence from British rule in 1960 than this bitter division surfaced. Civil disturbances erupted between Greek and Turkish Cypriots, necessitating the introduction of United Nations peacekeeping forces in 1964. (U.N. forces still remain in Cyprus.) Through the 1960s, the Greek Cypriots, concentrated in the southern part of the island, became increasingly estranged from the Turkish Cypriots, concentrated in the north.[4]

The tensions erupted again in 1974, this time with more violent results. In July, 1974, the civil government of the Republic of Cyprus was replaced by a government controlled by the Greek Cypriot military. In apparent response, on July 20, 1974, Turkey invaded Cyprus from the north. By late August, the Turkish military forces had advanced to occupy approximately the northern third of the island. The point at which the invading forces stopped is called the "Green Line." To this day, the heavily-guarded Green Line bisects Nicosia, the capital of the Republic, and splits the island from east to west.

The Turkish forces quickly established their own "government" north of the Green Line. In 1975, they formed what they called the "Turkish Federated State of Cyprus" ("TFSC"). In 1983, that administration was dissolved, and the "Turkish Republic of Northern Cyprus" ("TRNC") was formed. These "governments" were recognized immediately by Turkey, but all other nations in the world—including the United States—have never recognized them, and continue to recognize the Republic of Cyprus ("Republic"), plaintiff-appellee in this action, as the only legitimate government for all Cypriot people.

The Turkish invasion led to the forced southern exodus of over one-hundred thousand Greek Cypriots who lived in northern Cyprus. Turkish Cypriots living in southern Cyprus (and tens of thousands of settlers from mainland Turkey) likewise flooded into northern Cyprus, resulting in a massive exchange of populations.

Lythrankomi is in the northern portion of Cyprus that came under Turkish rule. Although the village and the Kanakaria Church were untouched by the invading forces in 1974, the villagers of Greek ancestry were soon thereafter "enclaved" by the Turkish military. Despite the hostile environment, the pastor and priests of the Kanakaria Church continued for two years to conduct religious services for the Greek Cypriots who remained in Lythrankomi. Hardy as they must have been, these clerics, and virtually all remaining Greek Cypriots, were forced to flee to southern Cyprus in the summer of 1976. Church of Cyprus officials testified that they intend to re-establish the congregation at the Kanakaria Church as soon as Greek Cypriots are permitted to return safely to Lythrankomi. (Thirty-five thousand Turkish troops remain in northern Cyprus.)[5]

When the priests evacuated the Kanakaria Church in 1976, the mosaic was still intact. In the late 1970s, however, Church

---

**2.** For more on the history, significance and restoration of the Kanakaria mosaic, *see* A. Megaw & E. Hawkins, *The Church of the Panagia Kanakaria at Lythrankomi in Cyprus: Its Mosaics and Frescoes* (1977).

**3.** For a full treatment of the pre-independence history of Cyprus, *see* Hill, *A History of Cyprus* (4 vols.) (1949).

**4.** This anxious period of Cypriot history is examined in T. Ehrlich, *Cyprus, the "Warlike Isle": Origins and Elements of the Current Crisis,* 18 Stan.L.Rev. 1021 (1966).

**5.** A fascinating, first-hand account of current conditions in Cyprus appears in Weaver, *Report from Cyprus,* The New Yorker, Aug. 6, 1990, pp. 65–81.

of Cyprus officials received increasing reports that Greek Cypriot churches and monuments in northern Cyprus were being attacked and vandalized, their contents stolen or destroyed. (Such reports were necessarily sketchy and unverifiable as officials from the Republic and Church of Cyprus have been denied access to northern Cyprus.) In November, 1979, a resident of· northern Cyprus brought word to the Republic's Department of Antiquities that this fate had also befallen the Kanakaria Church and its mosaic. Vandals had plundered the church, removing anything of value from its interior. The mosaic, or at least its most recognizable and valuable parts, had been forcibly ripped from the apse of the church. Once a place of worship, the Kanakaria Church had been reduced to a stable for farm animals.

Upon learning of the looting of the Kanakaria Church and the loss of its mosaics (made plural by the vandals' axes), the Republic of Cyprus took immediate steps to recover them. As discussed in greater detail in Judge Noland's opinion, see 717 F.Supp. at 1380, these efforts took the form of contacting and seeking assistance from many organizations and individuals, including the United Nations Educational, Scientific and Cultural Organization ("UNESCO"); the International Council of Museums; the International Council of Museums and Sites; Europa Nostra (an organization devoted to the conservation of the architectural heritage of Europe); the Council of Europe; international auction houses such as Christie's and Sotheby's; Harvard University's Dumbarton Oaks Institute for Byzantine Studies; and the foremost museums, curators and Byzantine scholars throughout the world. The Republic's United States Embassy also routinely disseminated information about lost cultural properties to journalists, U.S. officials and scores of scholars, architects and collectors in this country, asking for assistance in recovering the mosaics. The overall strategy behind these efforts was to get word to the experts and scholars who would probably be involved in any ultimate sale of the mosaics. These individuals, it was hoped, would be the most likely (only?)

actors in the chain of custody of stolen cultural properties who would be interested in helping the Republic and Church of Cyprus recover them.

The Republic's efforts have paid off. In recent years, the Republic has recovered and returned to the Church of Cyprus several stolen relics and antiquities. The Republic has even located frescoes and other works taken from the Kanakaria Church, including the four mosaics at issue here. These four mosaics, each measuring about two feet square, depict the figure of Jesus, the busts of one of the attending archangels, the apostle Matthew and the apostle James.

To understand how these pieces of the Kanakaria mosaic resurfaced, we must trace the actions of appellant Peg Goldberg and the other principals through whose hands they passed in 1988.

Peg Goldberg is an art dealer and gallery operator. Goldberg and Feldman Fine Arts, Inc., is the Indiana corporation that owns her gallery in Carmel, Indiana. In the summer of 1988, Peg Goldberg went to Europe to shop for works for her gallery. Although her main interest is 20th century paintings, etchings and sculptures, Goldberg was enticed while in The Netherlands by Robert Fitzgerald, another Indiana art dealer and "casual friend" of hers, to consider the purchase of "four early Christian mosaics." In that connection, Fitzgerald arranged a meeting in Amsterdam for July 1st. At that meeting, Fitzgerald introduced Goldberg to Michel van Rijn, a Dutch art dealer, and Ronald Faulk, a California attorney. Van Rijn and Faulk were strangers to Goldberg. All she knew about them was what she learned in their few meetings, which included the fact that van Rijn, a published expert on Christian icons (she was given a copy of the book), had been convicted by a French court for art forgery; that he claimed to be a descendant of both Rembrandt and Rubens; and that Faulk was in Europe to represent Fitzgerald and van Rijn.

At that first meeting in Amsterdam on July 1, 1988, van Rijn showed Goldberg photographs of the four mosaics at issue in

this case and told her that the seller wanted $3 million for them. Goldberg testified that she immediately "fell in love" with the mosaics. Van Rijn told her that the seller was a Turkish antiquities dealer who had "found" the mosaics in the rubble of an "extinct" church in northern Cyprus while working as an archaeologist "assigned (by Turkey) to northern Cyprus." (Goldberg knew of the Turkish invasion of Cyprus and of the subsequent division of the island.) As to the seller, Goldberg was also told that he had exported the mosaics to his home in Munich, Germany with the permission of the Turkish Cypriot government, and that he was now interested in selling the mosaics quickly because he had a "cash problem." Goldberg was not initially given the seller's identity. Goldberg also learned that Faulk, on behalf of Fitzgerald and van Rijn, had already met with this as-yet-unidentified seller to discuss the sale of these mosaics. Her interest quite piqued, Goldberg asked Faulk to return to Munich and tell the seller—whose identity, she would eventually learn, was Aydin Dikman—that she was interested.

Faulk dutifully took this message to Dikman in Munich, and returned to Amsterdam the following day. Faulk returned from that meeting with a contract he signed as agent for van Rijn to purchase the mosaics from Dikman for $350,000. When Goldberg met with Faulk on July 2, she was not told of this contract, however. Faulk merely informed her that Dikman still had the mosaics (though he was "actively negotiating with another buyer"), and that, in Faulk's opinion the export documents he had been shown by Dikman were in order. Faulk apparently showed Goldberg copies of a few of these documents, none of which, of course, were genuine, and at least one of which was obviously unrelated to these mosaics. *See Autocephalous*, 717 F.Supp. at 1382.

The next day (all of this happening rather fast), the principals gathered again in Amsterdam. Goldberg, van Rijn, Fitzgerald and Faulk agreed to "acquire the mosaics for their purchase price of $1,080,000 (U.S.)." The parties agreed to split the profits from any resale of the mosaics as follows: Goldberg 50%; Fitzgerald 22.5%; van Rijn 22.5%; and Faulk 5%. A document to this effect was executed on July 4, 1988, which document included a provision reading, "This agreement shall be governed by and any action commenced will be pursuant to the laws of the state of Indiana."

In those hectic early days of July, Goldberg contacted Otto N. Frenzel III, a friend and high-ranking officer at the Merchants National Bank of Indianapolis ("Merchants"), and requested a loan from Merchants of $1.2 million for the purchase of the mosaics. She told Frenzel that she needed $1,080,000 to pay van Rijn and the others, and she required the additional $120,000 to pay for expenses, insurance, restoration and the like. Merchants assured her that financing could be arranged, if she could provide appraisals and other documents substantiating the transaction. With Fitzgerald's and van Rijn's help, Goldberg obtained the appraisals (all three of which valued the mosaics at between $3 and $6 million), and sent them to Merchants. That done, she and Fitzgerald hurried to Geneva, Switzerland, for the transfer of the mosaics, which was to take place on July 5. After arriving in Switzerland, Goldberg learned that her requested loan had been approved by Merchants and the money would be forthcoming, though a few days behind schedule. Her financing secured, Goldberg proceeded to the July 5 meeting as scheduled. She could not yet turn over the money, but she wanted to get a look at what she was buying.

The July 5 meeting was held in the "free port" area of the Geneva airport, an area reserved for items that have not passed through Swiss customs. Faulk and Dikman arrived from Munich with the mosaics, which were stored in crates. Dikman introduced himself to Goldberg and then left; this brief exchange was the only time the two would meet. Goldberg then inspected the four mosaics. She testified that she "was in awe," and that, despite some concern about the mosaics' deteriorating condition, she wanted them "more than ever."

During the few days that Goldberg waited in Switzerland for the money to arrive from Merchants, she placed several telephone calls concerning the mosaics. She testified that she wanted to make sure the mosaics had not been reported stolen, and that no treaties would prevent her from bringing the mosaics into the United States. She called UNESCO's office in Geneva and inquired as to whether any treaties prevented "the removal of items from northern Cyprus in the mid- to late–1970s to Germany," but did not mention the mosaics. She claims also to have called, on advice from an art dealer friend of hers in New York, the International Foundation for Art Research ("IFAR"), an organization that collects information concerning stolen art. She testified that she asked IFAR whether it had any record of a claim to the mosaics, and that, when she called back later as instructed, IFAR told her it did not. Judge Noland clearly doubted the credibility of this testimony, noting, among other things, that neither Goldberg nor IFAR have any record of any such search. (A formal IFAR search involves a fee and thus generates a bill that would serve as proof that a search was performed.) *Autocephalous*, 717 F.Supp. at 1403. Judge Noland also questioned Goldberg's testimony that she telephoned customs officials in the United States, Switzerland, Germany and Turkey. *Id.* The only things of which Judge Noland was sure was that Goldberg did *not* contact the Republic of Cyprus or the TRNC (from one of whose lands she knew the mosaics had come); the Church of Cyprus; "Interpol," a European information-sharing network for police forces; nor "a single disinterested expert on Byzantine art." *Id.* at 1403–04.

However Goldberg occupied her time from July 5 to July 7, on the latter date the money arrived. Goldberg took the $1.2 million, reduced to $100 bills and stuffed into two satchels, and met with Faulk and Fitzgerald at the Geneva airport. As arranged, Goldberg kept $120,000 in cash and gave the remaining $1,080,000 to Faulk and Fitzgerald in return for the mosaics. Faulk and Fitzgerald in turn split the money with van Rijn, Dikman and their other cohorts as follows: $350,000 to Dikman (as per Faulk and van Rijn's prior agreement with him); $282,500 to van Rijn; $297,500 to Fitzgerald; $80,000 to Faulk; and $70,000 to another attorney in London. Along with the mosaics, Goldberg received a "General bill of sale" issued by Dikman to Goldberg and Feldman Fine Arts, Inc. The following day, July 8, 1988, Goldberg returned to the United States with her prize.

Back home in Indiana, Goldberg took what she had left of her $120,000 cut and deposited it into several of her business and personal bank accounts. After paying for the insurance and shipment of the mosaics, as well as a few unrelated art purchases, that sum amounted to approximately $70,000. Her friends and business associates in Indiana soon took quite an interest in her purchase; literally. For large sums of money, Frenzel, Goldberg's well-placed friend at Merchants, and another Indiana resident named Dr. Stewart Bick acquired from van Rijn and Fitzgerald substantial interests in the profits from any resale of the mosaics.

Peg Goldberg's efforts soon turned to just that: the resale of these valuable mosaics. She worked up sales brochures about them, and contacted several other dealers to help her find a buyer. Two of these dealers' searches led them both to Dr. Marion True of the Getty Museum in California. When told of these mosaics and their likely origin, the aptly-named Dr. True explained to the dealers that she had a working relationship with the Republic of Cyprus and that she was duty-bound to contact Cypriot officials about them. Dr. True called Dr. Vassos Karageorghis, the Director of the Republic's Department of Antiquities and one of the primary Cypriot officials involved in the worldwide search for the mosaics. Dr. Karageorghis verified that the Republic was in fact hunting for the mosaics that had been described to Dr. True, and he set in motion the investigative and legal machinery that ultimately resulted in the Republic learning that they were in Goldberg's possession in Indianapolis.

After their request for the return of the mosaics was refused by Goldberg, the Re-

public of Cyprus and the Church of Cyprus (collectively "Cyprus") brought this suit in the Southern District of Indiana for the recovery of the mosaics. Judge Noland bifurcated the possession and damages issues and held a bench trial on the former. In a detailed, thorough opinion (that occupies thirty-one pages in the Federal Supplement), Judge Noland awarded possession of the mosaics to the Church of Cyprus. Goldberg filed a timely appeal.

## II.  Analysis

### A.  Jurisdiction

Subject matter jurisdiction in this action was based on diversity of citizenship under 28 U.S.C. § 1332(a)(2), which vests jurisdiction in the federal district courts for actions of sufficient value between "citizens of a State, and foreign states or citizens or subjects thereof." [6]  Judge Noland found that the requirements of this subsection were met based on the following citizenships:

> Plaintiff the Republic of Cyprus is a sovereign nation located on the island of Cyprus in the Mediterranean Sea.  Plaintiff Autocephalous Greek–Orthodox Church of Cyprus is a religious organization with its principal offices in Nicosia, Cyprus.  Defendant Goldberg and Feldman Fine Arts, Inc. is a corporation organized and existing under the laws of the state of Indiana, with its principal place of business in Carmel, Indiana.  Defendant Peg Goldberg is a citizen of the state of Indiana.

*Autocephalous,* 717 F.Supp. at 1377.

Goldberg did not question these facts before the district court, nor in her original jurisdictional statement and briefs filed in this court.  Cyprus, for its part, asserted in its jurisdictional statement that "the Church of Cyprus is a citizen and subject of the Republic of Cyprus, and is a religious corporation under Cypriot law, maintains its principle [sic] place of business in Cyprus, and is empowered to own, regulate and administer property."  Appellees' Brief at 2 (citing record references).  Goldberg has since filed an "Amendment to Jurisdictional Statement and Suggestion of Jurisdictional Issue," stating that she "has now concluded that the record does not appear to support diversity jurisdiction because the record does not address the legal status and the citizenship of [the Church of Cyprus]." [7]  She alleges that, because "she has been unable to locate evidence in the record to establish that the Church of Cyprus is incorporated under the laws of any foreign state or that the Church should be considered a 'citizen or subject' of a foreign state," the Church should be considered an unincorporated association whose citizenship includes all jurisdictions of which its members are citizens. *Cf. Hummel v. Townsend,* 883 F.2d 367 (5th Cir.1989).  Goldberg recommends at least a remand for further proceedings as to the citizenship of all of the Church's members (if any are domiciled in Indiana, the argument goes, diversity is destroyed), and at best a remand with directions to dismiss for lack of jurisdiction.  Neither option is warranted.

Goldberg's argument substantially misstates the issue.  The primary question here is not whether the Church of Cyprus is incorporated under the laws of Cyprus.  Proving that it is incorporated under Cyp-

---

**6.**  In 1988, Congress amended 28 U.S.C. § 1332, changing, among other things, the language of § 1332(a)(2).  Because Cyprus filed this action before May 18, 1989 (the effective date of the 1988 amendments), the pre-amended version of 28 U.S.C. § 1332(a) applies.  (The changes to § 1332(a)(2) were, in any regard, only cosmetic.)

**7.**  We note that the belated nature of Goldberg's "discovery" of this jurisdictional issue does not foreclose our review, as the lack of subject matter jurisdiction may be raised at any stage in the case by any party, including this court on its own motion. *See* Fed.R.Civ.P. 12(h)(3); *Insurance Corporation of Ireland, Ltd. v. Compagnie Des Bauxites De Guinee,* 456 U.S. 694, 701–02, 102 S.Ct. 2099, 2103–04, 72 L.Ed.2d 492 (1982). *But see Buethe v. Britt Airlines, Inc.,* 787 F.2d 1194, 1196 (7th Cir.1986) (diversity jurisdiction established where "essential facts" regarding citizenship were adequately alleged and there was no "persuasive reason" to think allegations were false); *Kanzelberger v. Kanzelberger,* 782 F.2d 774, 777 (7th Cir.1986) ("We do not suggest that the district court or this court must always or even often conduct an inquest on jurisdiction.").

riot law is indeed one method for the Church to establish that it is a "citizen or subject" of Cyprus, *see Panalpina Welttransport GMBH v. Geosource, Inc.,* 764 F.2d 352, 354 (5th Cir.1985) ("A corporation incorporated in a foreign country is a citizen of that country for diversity purposes.") (citing, *inter alia, National Steamship Co. v. Tugman,* 106 U.S. 118, 1 S.Ct. 58, 27 L.Ed. 87 (1882)); but it is only one method. The primary issue here is whether the record contains sufficient evidence that, under the laws of the Republic of Cyprus, the Church is considered a juridical entity distinct from its members, regardless of its corporate status. *See Puerto Rico v. Russell & Co.,* 288 U.S. 476, 479–82, 53 S.Ct. 447, 448–49, 77 L.Ed. 903 (1933); *Cohn v. Rosenfeld,* 733 F.2d 625, 628–30 (9th Cir.1984). We stress that the citizenship status generally attributed to religious organizations under American law, as well as the characteristics of and requirements for the corporate form under American law, are irrelevant. As we stated in *Sadat v. Mertes,* 615 F.2d 1176, 1183 (7th Cir.1980):

> The generally accepted test for determining whether a person is a foreign citizen for purposes of 28 U.S.C. § 1332(a)(2) is whether the country in which citizenship is claimed would so recognize him. This is in accord with the principle of international law that "it is the inherent right of every independent nation to determine for itself, and according to its own constitution and laws, what classes of persons shall be entitled to citizenship."

(quoting *United States v. Wong Kim Ark,* 169 U.S. 649, 668, 18 S.Ct. 456, 464, 42 L.Ed. 890 (1898)). *See generally* 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* 2d, §§ 3604 & 3611 (1984).

▮ Cyprus presented the following evidence to the district court: 1) the Constitution of the Republic of Cyprus recognizes the existence of the Autocephalous Greek–Orthodox Church of Cyprus and grants to it the "exclusive right of regulating and administering its own internal affairs and property in accordance with the Holy Canons and its Charter;" 2) under the "Immovable Property (Tenure, Registration and Valuation) Law" of the Republic of Cyprus, a "religious corporation"—defined as a "religious establishment or religious institution belonging to any denomination and any throne, church, chapel, monastery, mosque, tekye, shrine or synagogue"—may own and register property; and 3) the Church of Cyprus registered the Kanakaria Church in the Land Registry Office of the Republic of Cyprus pursuant to this statute. (As to this last point, *see Autocephalous,* 717 F.Supp. at 1397, wherein Judge Noland discusses and describes the certificate of registration.)[8] We conclude that this evidence sufficiently established that the Church is recognized under and by the laws of the Republic of Cyprus as a distinct juridical entity, and thus is a "citizen or subject" of that state. *Cf. Puerto Rico,* 288 U.S. at 481–82, 53 S.Ct. at 449 (concluding that a Puerto Rican entity known as a *sociedad en comandita* is a "juridical person" for purposes of federal jurisdiction because the Puerto Rican Code, among other things, gives *sociedads* the power to contract, own property, transact business and sue or be sued in its own name); *Cohn,* 733 F.2d at 628–29 (concluding that Liechtenstein regards its *anstalts* as "juridical persons" for purposes of diversity jurisdiction based on similar factors). *See also Swan v. First Church of Christ, Scientist,* 225 F.2d 745, 747–48 (9th Cir.1955) (Though state law vested in the religious organizations at issue powers "far more limited than those found in the Puerto Rican *Sociedad,*" the organizations should be treated as state corporations for purposes of diversity jurisdiction because state law provided that they were to be "deemed bodies corporate for the purpose of taking and holding ... real or personal property," and other limited purposes).

**8.** As Cyprus has noted, that the Republic and the Church brought this suit as co-plaintiffs is also witness to the Republic's acceptance of the Church's right to sue (and be sued) in its own name.

## B. Choice of Law

■ As a federal court sitting in diversity, the district court was obligated to (and did) apply the law of the state in which it sat—Indiana. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This included Indiana law as to which body of substantive law to apply to the case, i.e. Indiana's choice of law rules. *See Consolidated Rail Corp. v. Allied Corp.,* 882 F.2d 254, 255 (7th Cir.1989) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). From his analysis and application of Indiana rules and decisions regarding choice of law, Judge Noland concluded that Indiana would choose to apply its own substantive law to this case. *Autocephalous,* 717 F.Supp. at 1393–95. This ruling actually contained two parts. First, Judge Noland applied the two-step "most significant contacts" test used by Indiana courts for choice of law in Indiana tort cases. *See Hubbard Mfg. Co., Inc. v. Greeson,* 515 N.E.2d 1071 (Ind.1987). Second, with the help of the trial testimony of an expert in the law of Switzerland, Judge Noland looked to Swiss choice of law principles and determined that they, too, dictate that Indiana substantive law should control. On appeal, Goldberg claims that both of these determinations were in error. Because we find Judge Noland's analysis under Indiana law to be free of error,[9] we affirm his conclusion that Indiana law ap-

plies without reaching his discussion of Swiss law.

The district court properly considered Cyprus' suit to recover the mosaics a replevin action, long recognized in Indiana law as the proper legal action for the recovery of wrongfully detained personal property. *See* 25 Indiana Law Encyclopedia ("I.L.E.") *Replevin* §§ 1, 2 & 11 (West 1960). The district court could find no Indiana case dealing specifically with choice of law in replevin actions, nor can we. Thus, we will look (as did Judge Noland) to the choice of law principles Indiana generally applies in tort cases.[10]

In *Hubbard,* 515 N.E.2d 1071, the Indiana Supreme Court modified Indiana's traditional *lex loci delicti commissi* rule for choice of law in tort cases. Under the traditional rule, the court chose the law of the state in which occurred "the last event necessary to make an actor liable," most times meaning the place of injury. *Id.* at 1073. *See also Consolidated Rail,* 882 F.2d at 256. Citing the often anomalous results that can obtain from the rigid application of this rule, as well as the recent trend away from it, the court in *Hubbard* declared that the *lex loci* rule should be applied only when the place of the tort is also the place with the most significant contacts. When the place of the tort bears little connection to the legal action, the court declared, the following factors should be considered:

---

9. We must employ a mixed standard of review as to this determination by Judge Noland. His conclusions as to the relevant Indiana choice of law principles, as legal conclusions, would ordinarily be reviewed *de novo. See, e.g., Forum Corp. of America v. Forum, Ltd.,* 903 F.2d 434, 438 (7th Cir.1990). As we have often stated, however, we give an extra measure of deference in diversity cases to the district judge's interpretation of the law of the state in which he sits. *See PPG Indus., Inc. v. Russell,* 887 F.2d 820, 823 (7th Cir.1989) (citing cases); *Goldstick v. ICM Realty,* 788 F.2d 456, 466 (7th Cir.1986) (same). Judge Noland's findings as to the facts necessary to resolve this issue, as well as his application of the law to these facts, will be reversed only upon a showing of clear error. *See Forum,* 903 F.2d at 438 (clearly erroneous standard for factual findings under Fed.R.Civ.P. 52(a)); *David Berg and Co. v. Gatto Int'l Trading Co., Inc.,* 884 F.2d 306, 309 (7th Cir.1989) (clearly

erroneous standard for district court's application of law to fact).

10. We chose tort principles because, as it is invoked by Cyprus, replevin, a free-standing cause of action in Indiana, is identical in all relevant respects to a tort claim for conversion. *Compare* 25 I.L.E. *Replevin* § 45 (plaintiff's burden in replevin claim) *with Noble v. Moistner,* 388 N.E.2d 620, 621–22 (Ind.App.1979) (elements of conversion claim). We note that Goldberg claims error in Judge Noland's decision similarly to look to tort principles, and expends a great deal of effort arguing conflict of laws principles used in actions involving the transfer of chattels, which is apparently how this action would be characterized under Swiss law. As to the application of Indiana law and principles, Goldberg's argument entirely misses the mark.

1) the place where the conduct causing the injury occurred;

2) the residence or place of business of the parties; and

3) the place where the relationship is centered.

*Id.* at 1073–74 (citing Restatement (Second) of Conflicts of Laws § 145(2) (1971)). *See also Tompkins v. Isbell,* 543 N.E.2d 680 (Ind.App.1989) (discussing and applying *Hubbard* approach). Thus, the court established a two-step test, the first inquiry focusing on the contacts between the place of the wrong and the legal action. If these contacts are significant, the *lex loci* rule should be applied; if not, the court should move to the second inquiry, which focuses on which jurisdiction has the most significant contacts.

In this case, Judge Noland first determined that Switzerland—"the place of the wrong" because it was at the Geneva airport that Goldberg took possession and control of the mosaics—bears little connection to Cyprus' cause of action. *Autocephalous,* 717 F.Supp. at 1393–94. He reached this conclusion based on his findings regarding the following facts: no Swiss citizen has or ever had an interest in this action, as none of the parties, actors in the transaction, or past or current interest-holders are Swiss citizens; and the temporal and geographical connection between the mosaics and Switzerland were "fortuitous and transitory," as the mosaics were on Swiss soil for only four days, never passed through Swiss customs (they remained in the "free port" area of the Geneva airport), and never otherwise entered the Swiss stream of commerce. Goldberg has failed to establish error in either these factual findings or the conclusion based thereon, choosing instead to reiterate Swiss "connections" considered and rejected by Judge Noland (e.g. the money Peg Goldberg paid for the mosaics was wired to her through a Swiss bank), and to cite us to an Indiana court's application of the *lex loci* doctrine in a factually inapposite case. *Tompkins,* 543 N.E.2d at 681–82 (law of place of tort applied in auto collision case where "the place of the tort has extensive connection with the legal action"). Thus,

we agree that in this case an Indiana court would find Switzerland's contacts too attenuated to apply the *lex loci* rule, and thus would proceed to the second step of the analysis. *Cf. Hubbard,* 515 N.E.2d at 1074 (events in Illinois unrelated to the action do not equal significant contacts).

Moving to step two of the *Hubbard* approach, the contacts between the action and the two contending jurisdictions (Indiana and Switzerland) must be reviewed, with special attention given to the Second Restatement factors. Applying this approach, Judge Noland noted the following facts that weigh in favor of applying Indiana law: the defendants, those who financed and effected the transfer of the mosaics, and those who now hold the principal monetary interests in the mosaics are all Indiana citizens; the money used to purchase the mosaics came from an Indiana bank; the agreement among Goldberg, Fitzgerald, van Rijn and Faulk stipulates that Indiana law will apply, indicating Goldberg's reliance on the law of her home state; and the mosaics are presently being held in Indiana, where they have been stored since they entered the U.S. in July, 1988. Based on our review of these and other facts as found by Judge Noland, we agree with his conclusion that Indiana has the more significant contacts with and interest in this action. Thus, Indiana law and rules govern every aspect of this action, from the statute of limitations issues through the application of the substantive law of replevin.

## C. Statute of Limitations

With great zeal, Goldberg has from the beginning of this action challenged the timeliness of Cyprus' complaint. Under Indiana's statute of limitations for replevin actions, Cyprus had six years from the time its cause of action accrued in which to sue for the recovery of the mosaics. Ind.Code § 34–1–2–1 (1982). Though the exact date of the looting of the Kanakaria Church is unknown, it is agreed that Cyprus first learned of the theft of their mosaics in November, 1979. It is also agreed that Cyprus first learned that the mosaics were

in Goldberg's possession in late 1988. If Cyprus' cause of action accrued on the former date, their complaint, filed in March, 1989, was untimely. If, on the other hand, it accrued on the latter date (or at any other point after March, 1983), their complaint was timely. Thus, the dispositive determination is when did Cyprus' cause of action "accrue" within the meaning of Indiana's limitations statute.

The determination of when Cyprus' cause of action accrued involves the interpretation of Indiana authorities and their application to the facts of this case. As we state above, *supra* at note 9, we give substantial deference to the district court's resolution of such issues, as we assume that the district court has greater expertise in interpreting and applying the law of the state in which it sits. Our review of Judge Noland's statute of limitations analysis convinces us that he has here proved true that assumption.

■ As Judge Noland noted, it is well-established in Indiana law that it is the courts' responsibility to determine, based on the facts of each case, when the cause of action accrues. *See, e.g., Burks v. Rushmore,* 534 N.E.2d 1101, 1103 (Ind. 1989). In carrying out this responsibility, Indiana courts start with the following general rule: a cause of action accrues when the plaintiff ascertains, or by due diligence could ascertain, actionable damages. *Burks,* 534 N.E.2d at 1103–04 (citing, *inter alia, Barnes v. A.H. Robbins Co., Inc.,* 476 N.E.2d 84 (Ind.1985)). Several Indiana decisions have recognized, as a corollary to this general rule, a "discovery rule" for the accrual of a cause of action; *to wit,* "the statute of limitations commences to run 'from the date plaintiff knew or should have discovered that she suffered an injury or impingement, and that it was caused by the product or act of another.'" *Burks,* 534 N.E.2d at 1104 (quoting *Barnes,* 476 N.E.2d at 87–88). Although the first enun-

ciation of the discovery rule was quite guarded, *see Barnes,* 476 N.E.2d at 87, Indiana courts have since evidenced a willingness to extend it to new types of cases and situations. *See, e.g., Covalt v. Carey Canada, Inc.,* 543 N.E.2d 382 (Ind.1989); *Burks,* 534 N.E.2d at 1103–04; *Groen v. Elkins,* 551 N.E.2d 876, 879 (Ind.App.1990). *See also Walters v. Owens–Corning Fiberglass Corp.,* 781 F.2d 570, 572 (7th Cir. 1986).

Apart from but related to the discovery rule, Indiana recognizes, by both statute and case law, the doctrine of fraudulent concealment. Under this doctrine, a defendant who has by deceit or fraud prevented a potential plaintiff from learning of a cause of action cannot take advantage of his wrongdoing by raising the statute of limitations as a bar to plaintiff's action. *See* Ind.Code § 34–1–2–9 (1982); *Burks,* 534 N.E.2d at 1104.[11]

Central to both the discovery rule and the doctrine of fraudulent concealment is the determination of the plaintiff's diligence in investigating the potential cause of action. *See Burks,* 534 F.2d at 1104 (under discovery rule, statute begins to run when damage was "ascertained or ascertainable by due diligence"); *Guy v. Schuldt,* 236 Ind. 101, 138 N.E.2d 891, 896 (1956) (despite fraudulent concealment, if plaintiff was not reasonably diligent in discovering fraud "the statute will run from the time discovery ought to have been made").

■ Applying these Indiana rules and principles to this case, and unguided by any directly analogous Indiana precedent, Judge Noland concluded that an Indiana court would find that Cyprus' action was timely filed. *Autocephalous,* 717 F.Supp. at 1388–93. His primary ground for so concluding was his determination that, under a discovery rule, Cyprus' cause of action did not accrue until Cyprus learned

---

11. Judge Noland also discusses the doctrine, recognized by Indiana courts, of equitable estoppel. *Autocephalous,* 717 F.Supp. at 1388. As this doctrine is identical in all respects relevant here to the statutory doctrine of fraudulent concealment, *see, e.g., Spoljaric v. Pangan,* 466 N.E.2d 37, 44–45 (Ind.App.1984); *Weinstock v. Ott,* 444 N.E.2d 1227, 1235–36 (Ind.App.1983), and as the application of the discovery rule alone adequately resolves the issue in this case, we will not explore further this equitable doctrine.

from Dr. True that the mosaics were in Goldberg's possession in Indiana. In so holding, he looked not only to Indiana cases but also to general discovery rule principles, *see* 51 Am.Jur.2d *Limitation of Actions* § 146 (1970); 54 C.J.S. *Limitation of Actions* § 87 (1987); and to *O'Keeffe v. Snyder,* 83 N.J. 478, 416 A.2d 862 (1980), a decision of the New Jersey Supreme Court addressing the accrual of a cause of action in the context of a replevin action involving a work of art. (In *O'Keeffe,* the court held that artist Georgia O'Keeffe's cause of action for replevin of three paintings stolen from a gallery in 1946 accrued "when she first knew, or reasonably should have known through the exercise of due diligence, of the cause of action, including the identity of the possessor of the paintings." 416 A.2d at 870.) Further, Judge Noland found, as a necessary precondition to the application of the discovery rule, that Cyprus exercised due diligence in searching for the mosaics. Thus, Judge Noland ruled that Cyprus was not, nor reasonably should have been, on notice as to the possessor or location of the mosaics until late 1988. *Autocephalous,* 717 F.Supp. at 1389–91.

Goldberg attacks Judge Noland's discovery rule analysis on two grounds. First, she charges that in applying the discovery rule in this case Judge Noland "announced a new rule of Indiana law in conflict with established Indiana limitations principles." Not so. Judge Noland applied legal principles set out in Indiana cases, and generally accepted elsewhere, to a new situation not yet addressed by the Indiana courts, exactly what a district court sitting in diversity is obligated to do when presented with a novel issue under state law. *See* 19 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4507 (1984). Further, his conclusion that in this case the operative "discovery" had to include the identity of the holder of the mosaics is eminently sound. In the context of a replevin action for particular, unique and concealed works of art, a plaintiff can-

not be said to have "discovered" his cause of action until he learns enough facts to form its basis, which must include the fact that the works are being held by another and who, or at least where, that "other" is. *See O'Keeffe,* 416 A.2d at 869–70. Further, we note that any "laziness" this rule might at first blush invite on the part of plaintiffs is heavily tempered by the requirement that, all the while, the plaintiff must exercise due diligence to investigate the theft and recover the works.

Second, Goldberg attacks Judge Noland's due diligence finding. Specifically, she argues that Cyprus failed to contact several organizations it should have, particularly IFAR and Interpol. She also repeats the argument she made to Judge Noland that events occurring before the end of 1983 [12] should have started the clock ticking on Cyprus' cause of action, with particular emphasis on an article that appeared in a Turkish newspaper. We note first that the due diligence determination is, as Judge Noland noted, highly "fact-sensitive and must be decided on a case-by-case basis." *Autocephalous,* 717 F.Supp. at 1389. Although Goldberg cites some support for a *de novo* standard of review on this issue, *see DeWeerth v. Baldinger,* 836 F.2d 103, 110 (2d Cir.1987), *cert. denied,* 486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988), we ordinarily review determinations such as this, which involve the application of law to facts, under the "clearly erroneous" standard. *See supra* at note 9. *See also Mucha v. King,* 792 F.2d 602, 604–06 (7th Cir.1986). Further, in this case the assessment of Cyprus' diligence necessarily involves a contextual analysis of "a particular and nonrecurring set of historical events," *Mucha,* 792 F.2d at 605, as well as an assessment of the credibility of the various witnesses who testified as to what Cypriot officials knew and when they knew it. Thus, there is substantial support for a very deferential standard of review. *Cf. Louis Dreyfus Corp. v. 27,946 Long Tons of Corn,* 830 F.2d 1321, 1325–27 (5th Cir.

---

**12.** Note that any events occurring after 1983, including the acquisition in 1984 by the Menil Foundation in Texas of other Kanakaria mosaic fragments and frescoes from Dikman (of which

Goldberg makes much), even if they triggered the accrual of Cyprus' six-year statute of limitations, would not make Cyprus' March, 1989 complaint untimely.

1987) (due diligence finding reviewed under clearly erroneous standard). Under any standard of review, however, Judge Noland's due diligence determination must be affirmed.

The record evidence (summarized above) makes it clear that, although the Republic of Cyprus may not have contacted all the organizations Goldberg in hindsight would require, it took substantial and meaningful steps, from the time it first learned of the disappearance of the mosaics, to locate and recover them. The efforts by the Republic's officials, targeted at the likely points of sale of the mosaics, were sweeping and consistent with trade practices. Indeed, one expert, a curator from The Walters Art Gallery in Baltimore, Maryland, testified at trial that Cyprus "stands apart" in its efforts to recover stolen cultural properties. *Autocephalous*, 717 F.Supp. at 1389 (quoting testimony of Dr. Vikan). As to Goldberg's repetition here of her arguments regarding the article in the Turkish publication and the other events, the record adequately supports Judge Noland's conclusion that these events did not nor should not have put Cyprus on notice as to a possible cause of action. The article, which fingered Dikman as a man wanted in Cyprus and Turkey for smuggling artifacts and later mentioned the mosaics from the Kanakaria Church, did not reveal that Dikman might be in possession of the mosaics from the Kanakaria Church. What's more, the record reveals that, upon learning of such Turkish press reports, Cyprus redoubled its efforts at notification and recovery. In sum, then, Judge Noland's conclusion that Cyprus was duly diligent and should not have discovered its cause of action before late 1988 stands on firm factual footing. Goldberg's fervent attack on this conclusion at most establishes that an alternative view of the evidence was plausible, which is not enough to merit our disturbing it.

Judge Noland backstopped his discovery rule analysis by also applying the doctrine of fraudulent concealment to the facts of this case. From that application, Judge Noland concluded that the statute of limitations on Cyprus' action was tolled until at least the end of 1983, and thus Cyprus' March, 1989 complaint was timely. *Autocephalous*, 717 F.Supp. at 1391–93. Goldberg takes issue with this conclusion, arguing, *inter alia*, that it is counter to Indiana law as expressed in *Landers v. Evers*, 107 Ind.App. 347, 24 N.E.2d 796 (1940), a case Judge Noland distinguished on the ground that, in *Landers*, the court found that the plaintiff did not exercise due diligence. Because we find no error in Judge Noland's analysis and application of the discovery rule, we need not and will not pass on the fraudulent concealment issue. Similarly, because we find no error in Judge Noland's determination that Cyprus was duly diligent and their action timely filed, we agree with his decision to reject without further discussion Goldberg's laches and estoppel arguments, and we follow the same prudent course.

## D. The Merits of the Replevin Claim

■ Under Indiana law, replevin is an action at law "whereby the owner or person claiming the possession of personal goods may recover such personal goods where they have been wrongfully taken or unlawfully detained." 25 I.L.E. *Replevin* § 1. "The gist of the action is the defendant's unlawful detention of the plaintiff's property. The issue litigated is the present right to the possession of the property in controversy, and the purpose of the action is to determine who shall have possession of the property sought to be replevied." *Id.* at § 2 (citations omitted). *See also State Exchange Bank of Culver v. Teague*, 495 N.E.2d 262, 266 (Ind.App.1986). To recover the item sought to be replevied, (which is the primary remedy in a replevin action, *see Kegerreis v. Auto–Owners Insurance Co.*, 484 N.E.2d 976, 982 (Ind.App. 1985)), the plaintiff must establish three elements: "his title or right to possession, that the property is unlawfully detained, and that the defendant wrongfully holds possession." 25 I.L.E. *Replevin* § 42 (citations omitted). *See also Snyder v. International Harvester Credit Corp.*, 147 Ind. App. 364, 261 N.E.2d 71, 73 (1970).

■ Judge Noland applied these elements to the facts of this case and determined that Cyprus had met its burden as to each. *Autocephalous*, 717 F.Supp. at 1397–1400. Our review of this application of Indiana law to the facts convinces us that it is free of error: 1) the Kanakaria Church was and is owned by the Holy Archbishopric of the Church of Cyprus, a self-headed (hence "Autocephalous") church associated with the Greek–Orthodox faith; 2) the mosaics were removed from the Kanakaria Church without the authorization of the Church or the Republic (even the TRNC's unsuccessful motion to intervene claimed that the mosaics were improperly removed); and 3) Goldberg, as an ultimate purchaser from a thief, has no valid claim of title or right to possession of the mosaics.[13]

We note that Judge Noland again backstopped his conclusion, this time conducting an alternative analysis under Swiss substantive law. *See Autocephalous*, 717 F.Supp. at 1400–04. Briefly, the court concluded that the Church had superior title under Swiss law as well, because Goldberg could not claim valid title under the Swiss "good faith purchasers" notion having only made a cursory inquiry into the suspicious circumstances surrounding the sale of the mosaics. (Under Indiana law, such considerations are irrelevant because, except in very limited exceptions not applicable here, a subsequent purchaser (even a "good faith, *bona fide* purchaser for value") who obtains an item from a thief only acquires the title held by the thief; that is, *no* title. 6 I.L.E. *Conversion* § 15.) As we state above, Indiana law controls every aspect of this action. Thus, Judge Noland's extensive (and quite interesting) discussion of Swiss law, as well as Goldberg's lengthy

attack thereon, need not be reviewed. Cyprus adequately established the elements of replevin under Indiana law, on which ground alone we affirm the district court's decision to award the possession of the mosaics to the Church of Cyprus.

**E. The Effect of the TFSC Edicts**

Finally, Goldberg argues that several decrees of the TFSC (the entity established in northern Cyprus by the Turkish military immediately after the 1974 invasion) divested the Church of title to the mosaics.[14] Goldberg asks us to honor these decrees under the notion that in some instances courts in the United States can give effect to the acts of nonrecognized but *"de facto"* regimes if the acts relate to purely local matters. *See Restatement (Third) of the Foreign Relations Law of the United States ("Third Restatement")* § 205(3) (1987);[15] *Salimoff v. Standard Oil Co.*, 262 N.Y. 220, 186 N.E. 679 (1933) (Under Soviet law, U.S.S.R. nationalization decree effective to pass title to oil within Russia despite fact that U.S.S.R. was not yet recognized by the U.S.). The TFSC decrees at issue, all propagated in 1975, are principally these: 1) the "Abandoned Movable Property Law," which provided that all movable property within the boundaries of the TFSC abandoned by its owner because of the owner's "departure" from northern Cyprus "as a result of the situation after 20th July 1974" now belongs to the TFSC "in the name of the Turkish Community" and that the TFSC "is responsible for the possession and control of such property;" and 2) the "Antiquities Ordinance," which provided that all religious buildings and antiquities, including specifically "synagogues, basilicas, churches, monasteries and the

---

**13.** The only allegation of error as to this analysis raised by Goldberg regards the first element. Goldberg claims that certain decrees of the Turkish administration in northern Cyprus stripped the Church of its claim of title to the Kanakaria Church and any movable property contained therein or taken therefrom. This allegation is discussed in a separate section below.

**14.** Judge Noland ignored these decrees, presented to him at the latter stages of the trial and in a lengthy post-trial submission, as irrelevant.

**15.** This Restatement section provides:

[C]ourts in the United States ordinarily give effect to acts of a regime representing an entity not recognized as a state, or of a regime not recognized as the government of a state, if those acts apply to territory under the control of that regime and relate to domestic matters only.

like," located north of the Green Line, as well as any and all "movable antiquities" contained therein, are now the property of the TFSC.[16] Because these decrees were enacted before the Kanakaria Church was looted and its mosaics stolen, the argument concludes, the Church cannot here claim to hold title to the mosaics.

It is helpful to note at the outset what is *not* being claimed here. First, Goldberg does not (and cannot) suggest that this court should pass on the validity of the Turkish administration in northern Cyprus. We repeat here precepts that are well-established in the law of this country:

> [T]he conduct of foreign relations was committed by the Constitution to the political departments of the government, and the propriety of what may be done in the exercise of this political power [is] not subject to judicial inquiry or decision, ... [and] who is the sovereign of a territory is not a judicial question, but one the determination of which by the political departments conclusively binds the courts[.]

*United States v. Belmont,* 301 U.S. 324, 328, 57 S.Ct. 758, 759–60, 81 L.Ed. 1134 (1937) (citing *Oetjen v. Central Leather Co.,* 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918)). Indeed, Goldberg herself supports the district court's decision to deny the TRNC's motion to intervene in this case, which decision was based on the TRNC's continued status as a nonrecognized entity. *See Third Restatement* § 205(1) (entity not recognized as a state ordinarily denied access to U.S. courts); *Republic of Vietnam v. Pfizer, Inc.,* 556 F.2d 892 (8th Cir.1977).

Second, this is not a case in which one party is claiming title under the laws of a state that has been entirely displaced, and the other is claiming title under the laws of the new, displacing regime. All Goldberg can hope to gain from the invocation of these TFSC edicts is a finding that the Church's claim of title is defective; she has no plausible claim of valid title in herself based on these edicts. This fact sets this

case apart from the cases cited by Goldberg, including *Salimoff,* 186 N.E. 679 (plaintiff Russian nationals claimed title to property under laws of the old Russian Empire and defendant U.S. companies claimed title due to purchase from Soviet government, which seized the property pursuant to nationalization decree); and *The Denny,* 127 F.2d 404 (3d Cir.1942) (dispute between Lithuanian citizens wherein both claimed right to possess property as agents under Lithuanian law, one relying on the effect of nationalization decrees of the Lithuanian Soviet Socialist Republic, the other on pre-nationalization law). *See also Hesperides Hotels Ltd. v. Aegean Turkish Holidays Ltd.,* 1 Q.B. 205 (C.A.1977), *aff'd,* A.C. 508 (H.L.1978) (House of Lords declined to allow suit which would require British courts to determine who had the superior claim of title to hotels in northern Cyprus as between the pre-invasion owners or the owners recognized and protected by the Turkish administration).

What Goldberg is claiming is that the TFSC's confiscatory decrees, adopted only one year after the Turkish invasion, should be given effect by this court because the TFSC and its successor TRNC should now be viewed as the *"de facto"* government north of the Green Line. This we are unwilling to do. We draw on two lines of precedent as support for our decision. First, we note that, contrary to the New York court's decision in *Salimoff,* 186 N.E. 679, several courts of the same era refused to give effect to the nationalization decrees of the as-yet-unrecognized Soviet Republics. These courts relied on a variety of grounds, including especially the fact that the political branches of our government still refused to recognize these entities. *See, e.g., Latvian State Cargo & Passenger S.S. Line v. McGrath,* 188 F.2d 1000, 1002–04 (D.C.Cir.1951) (also stating as a possible alternative ground the following view: "since the nationalization decrees here involved were confiscatory and thus

---

**16.** We note that Cyprus has raised arguments that cast substantial doubt on the actual meaning and effect of these and other TFSC decrees, even should we decide to apply them. For the purposes of disposing of Goldberg's argument, however, we will assume that the TFSC decrees actually mean what Goldberg represents them to mean.

contrary to the public policy of this country, our courts would in no event give them effect," and citing cases); *The Maret*, 145 F.2d 431, 442 (3d Cir.1944) ("[N]o valid distinction can be drawn between the political or diplomatic act of nonrecognition of a sovereign and nonrecognition of the decrees or acts of that sovereign.... Nonrecognition of a foreign sovereign and nonrecognition of its decrees are to be deemed to be as essential a part of the power confided by the Constitution to the Executive for the conduct of foreign affairs as recognition.") (citing *United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942)). Similarly, as regards the Turkish administration in northern Cyprus, the United States government (like the rest of the non-Turkish world) has not recognized its legitimacy, nor does our government "recognize that [the Turkish administration] has functioned as a de facto or quasi government ..., ruling within its own borders." *Salimoff*, 186 N.E. at 682 (relying on the fact that the U.S. government had so "recognized" the Soviet government).

Second, we are guided in part by the post-Civil War cases in which courts refused to give effect to property-affecting acts of the Confederate state legislatures. In one such case, *Williams v. Bruffy*, 96 U.S. 176, 24 L.Ed. 716 (1878), the Supreme Court drew a helpful distinction between two kinds of *"de facto"* governments. The first kind "is such as exists after it has expelled the regularly constituted authorities from the seats of power and the public offices, and established its own functionaries in their places, so as to represent in fact the sovereignty of the nation." *Id.* at 185. This kind of *de facto* government, the Court explained, "is treated as in most respects possessing rightful authority, ... [and] its legislation is in general recognized." *Id.* The second kind of *de facto* government "is such as exists where a portion of the inhabitants of a country have separated themselves from the parent State and established an independent government. The validity of its acts, both against the parent State and its citizens or subjects, depends entirely upon its ultimate success.... If it succeed, and become rec-

ognized, its acts from the commencement of its existence are upheld as those of an independent nation." *Id.* at 186. (The Court held that the Confederacy was a government of the second type that ultimately failed.) Goldberg argues that the TFSC and its successor TRNC have achieved the level of "ultimate success" contemplated by this standard, because they have maintained control of the territory north of the Green Line for over fifteen years. We will not thus equate simple longevity of control with "ultimate success." The Turkish forces, despite their best efforts, did not completely supplant the Republic nor its officers. Instead, the TFSC and the TRNC, neither of which has ever been recognized by the non-Turkish world, only acceded to the control of the northern portion of Cyprus. The Republic of Cyprus remains the only recognized Cypriot government, the sovereign nation for the entire island. Rejecting Goldberg's invitation to delve any further into facts and current events which are not of record in this proceeding, we conclude that the confiscatory decrees proffered by Goldberg do not divest the Church of its claim of title.

### III. Conclusion

As Byron's poem laments, war can reduce our grandest and most sacred temples to mere "fragments of stone." Only the lowest of scoundrels attempt to reap personal gain from this collective loss. Those who plundered the churches and monuments of war-torn Cyprus, hoarded their relics away, and are now smuggling and selling them for large sums, are just such blackguards. The Republic of Cyprus, with diligent effort and the help of friends like Dr. True, has been able to locate several of these stolen antiquities; items of vast cultural, religious (and, as this case demonstrates, monetary) value. Among such finds are the pieces of the Kanakaria mosaic at issue in this case. Unfortunately, when these mosaics surfaced they were in the hands not of the most guilty parties, but of Peg Goldberg and her gallery. Correctly applying Indiana law, the district

court determined that Goldberg must return the mosaics to their rightful owner: the Church of Cyprus. Goldberg's tireless attacks have not established reversible error in that determination, and thus, for the reasons discussed above, the district court's judgment is AFFIRMED.

Lest this result seem too harsh, we should note that those who wish to purchase art work on the international market, undoubtedly a ticklish business, are not without means by which to protect themselves. Especially when circumstances are as suspicious as those that faced Peg Goldberg, prospective purchasers would do best to do more than make a few last-minute phone calls. As testified to at trial, in a transaction like this, "All the red flags are up, all the red lights are on, all the sirens are blaring." *Autocephalous*, 717 F.Supp. at 1402 (quoting testimony of Dr. Vikan). In such cases, dealers can (and probably should) take steps such as a formal IFAR search; a documented authenticity check by disinterested experts; a full background search of the seller and his claim of title; insurance protection and a contingency sales contract; and the like. If Goldberg would have pursued such methods, perhaps she would have discovered in time what she has now discovered too late: the Church has a valid, superior and enforceable claim to these Byzantine treasures, which therefore must be returned to it.

CUDAHY, Circuit Judge, concurring:

### I.

Although I concur in all respects in the excellent majority opinion, there are two points that I believe merit elucidation. The first of these involves the difficult problem of the time of accrual of the cause of action in replevin. The majority opinion affirms the holding of the district court, based on its interpretation of Indiana law, that the plaintiff's cause of action does not accrue until it has, *or reasonably should have*, discovered the location of the stolen property—in this case the Cypriot mosaics. Although we accept the district court's construction of Indiana law, it is unnecessary to rely solely upon this application of the discovery rule. For, as a recent study of the law of missing property demonstrates, whenever the possessor of lost or stolen personal property commits "fraud in the concealment," the statute of limitations does not run against the original owner until that owner has *actual knowledge* of the location of the property and of the identity of the possessor.[1]

This concept is analogous to the requirement that one who asserts a statute of limitations defense against an action for the recovery of *real* property must have possessed the property in an "open and notorious" manner. Because it is difficult to assess openness of possession in the realm of personal property, courts have required good faith on the part of the possessor to satisfy, or substitute for, the openness requirement. Most courts considering this problem have thus concluded that the statute of limitations should not run against an original owner who lacks the facts necessary to institute suit as long as the property is held by the original thief or by a subsequent holder acting in bad faith.[2]

If a good faith requirement were applied to the facts of the case before us, the

---

1. Gerstenblith, *The Adverse Possession of Personal Property*, 37 Buffalo L.Rev. 119, 127 (1989).

2. *See, e.g., Frye v. Commonwealth Inv. Co.*, 107 Ga.App. 739, 741, 131 S.E.2d 569, 571, *aff'd*, 219 Ga. 498, 134 S.E.2d 39 (1963); *Commercial Union Ins. Co. v. Connolly*, 183 Minn. 1, 6, 235 N.W. 634, 636 (1931); *Lightfoot v. Davis*, 198 N.Y. 261, 266, 91 N.E. 582, 583–84 (1910). *See generally* Gerstenblith, *supra* note 1, at 126–31.

The "demand and refusal" rule applied by the New York courts, however, constitutes one exception to this general approach. Under the "demand and refusal" rule, the statute of limitations for a replevin action does not run until the

original owner makes a demand of the current possessor for the return of the property and the possessor refuses. *See, e.g., De Weerth v. Baldinger*, 836 F.2d 103 (2d Cir.1987), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988); *Kunstsammlungen zu Weimar v. Elicofon*, 678 F.2d 1150 (2d Cir.1982); *Menzel v. List*, 22 A.D.2d 647, 253 N.Y.S.2d 43 (1964), and 49 Misc.2d 300, 267 N.Y.S.2d 804 (Sup.Ct.1966), *modified on other grounds*, 28 A.D.2d 516, 279 N.Y.S.2d 608 (1967), *modification rev'd*, 24 N.Y.2d 91, 246 N.E.2d 742, 298 N.Y.S.2d 979 (1969). An old Indiana decision, in fact, holds that the original owner of stolen property can-

statute of limitations would not have begun to run so long as the mosaics were in the hands of Dikman, the original thief. Nor would Goldberg's purchase of the mosaics in July 1988 have triggered the running of the statute. As Judge Noland pointed out, Goldberg undertook only a cursory inquiry into Dikman's ability to convey good title under circumstances which should have aroused the suspicions of a wholly innocent and reasonably prudent purchaser. She thus does not appear to have been a good faith purchaser. Under the foregoing analysis, the cause of action would not have accrued until later in 1988, when Cyprus first ascertained the location of the mosaics and the identity of the current possessor. This approach, which seems equitable to me, thus poses no bar to a cause of action for replevin of the mosaics. An owner should not be at risk under the statute of limitations until she has actual knowledge or the property has passed into innocent hands.

## II.

A second and unrelated, but important, aspect of this case involves the treatment of the cultural heritage of foreign nations under international and United States law. The United States has both acceded to international agreements and enacted its own statutes regarding the importation of cultural property. These regulatory efforts have encompassed transfers of property during both wartime and peacetime and apply whether the property was originally stolen or "merely" illegally exported from the country of origin. The two most significant international agreements that attempt to protect cultural property are the 1954 Convention on the Protection of Cultural Property in the Event of Armed Conflict (the "1954 Hague Convention"), 249 U.N.T.S. 215 (1956), and the UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Transport, Export and Transfer of Ownership of Cultural Property (the "UNESCO Convention"), 823 U.N.T.S. 231 (1972). Under both these multinational treaties, as well as under the United States' Convention on Cultural Property Implementation Act, 19 U.S.C. § 2601 et seq. (1983), the Cypriot mosaics would be considered cultural property warranting international protection. For ex-

not sue the good faith possessor for conversion until the owner has made a demand upon the possessor for the return of the property. See Wood v. Cohen & Another, 6 Ind. 455 (1855). The original purpose of this rule was to protect the good faith possessor who, upon learning of the original theft, would presumably return the property to the rightful owner voluntarily and without need for litigation.

Some courts adopt a slightly different approach—the O'Keeffe "discovery" rule—emphasizing the due diligence of the original owner, as in O'Keeffe v. Snyder, 83 N.J. 478, 416 A.2d 862 (1980), rather than lack of good faith on the part of the possessor. In DeWeerth v. Baldinger, 836 F.2d 103 (2d Cir.1987), the Second Circuit, exercising its diversity jurisdiction and interpreting New York law, found that New York's "demand and refusal" rule incorporates the requirement that the original owner exercise reasonable diligence in locating the stolen property. In a recent statement on the subject by a New York court, however, the defense was characterized as one of laches, rather than as a statute of limitations bar. The laches defense required a showing of prejudice to the defendant by the delay as well as knowledge or imputed knowledge on the part of the plaintiff and a showing of reasonableness of the plaintiff's conduct under the particular circumstances.

See Solomon R. Guggenheim Foundation v. Lubell, 153 A.D.2d 143, 550 N.Y.S.2d 618 (N.Y.App. Div.1990), leave to appeal to the N.Y. Court of Appeals granted, App.Div., 554 N.Y.S.2d 992 (1990). The New York appellate court, in remanding to the trial court, was reluctant to conclude that the defendant was prejudiced by any asserted delay by the plaintiff even though the defendant was arguably a good faith purchaser of the stolen art works. The court there stated that the "defendant's vigilance is as much in issue as plaintiff's diligence." 153 A.D.2d at 152, 550 N.Y.S.2d at 623. The emphasis in the present case on Cyprus' diligence should also be tempered by the plaintiff's lack of good faith, as found by Judge Noland. Lack of good faith minimizes the likelihood of prejudice to the defendant. Following the Lubell decision, a judge in the Southern District of New York recently denied a motion to dismiss by the defendant in a suit in which the Turkish government is attempting to recover various archaeological materials from the Metropolitan Museum of Art. Judge Broderick denied defendant's motion based on the statute of limitations, so that the issues of prejudice allegedly caused by plaintiff's delay and the defendant's good faith could be extensively considered. See N.Y. Times, July 20, 1990, at C 25, col. 1.

ample, Article I of the UNESCO Convention defines cultural property as "property which, on religious or secular grounds, is specifically designated by each State as being of importance for archaeology, prehistory, history, literature, art or science and which belongs to one or more of the following categories:

(d) elements of artistic or historical monuments or archaeological sites which have been dismembered;

(e) antiquities more than one hundred years old ...;

(g) property of artistic interest, such as:

(i) pictures, paintings and drawings produced entirely by hand on any support and in any material...."

The 1954 Hague Convention may be applicable to the case before us given the incursion of Turkish armed forces into Cyprus in 1974 and our ongoing refusal to recognize the government established in the northern part of Cyprus. The 1954 Hague Convention, which is but the most recent multilateral agreement in a 200–year history of international attempts to protect cultural property during wartime,[3] prohibits the destruction or seizure of cultural property during armed conflict, whether international or civil in nature, and during periods of belligerent occupation. The Hague Convention also applies to international trafficking during peacetime in cultural property unlawfully seized during an armed conflict. The attempt of the government established in northern Cyprus by the Turkish military to divest the Greek Cypriot church of ownership of the mosaics might be viewed as an interference of the sort contemplated by the 1954 Hague Convention. If this were the case, the acts and decrees of the northern Cyprus government divesting title to this cultural property would not demand the deference of American courts.

The second international agreement, the UNESCO Convention, focuses on private conduct, primarily during peacetime, and thus is also applicable to the theft and removal of the mosaics from Cyprus.[4] Article 7 of that Convention requires signatory nations:

(a) To take the necessary measures, consistent with national legislation, to prevent museums and similar institutions within their territories from acquiring cultural property originating in another State Party which has been illegally exported....;

(b)(i) to prohibit the import of cultural property stolen from a museum or a religious or secular public monument or similar institution in another State Party ..., provided that such property is documented as appertaining to the inventory of that institution;

(ii) at the request of the State Party of origin, to take appropriate steps to recover and return any such cultural property ..., provided, however, that the requesting State shall pay just compensation to an innocent purchaser or to a person who has valid title to that property....

It is clear that the mosaics in the case before us were stolen (under any reasonable definition of that word) from a religious institution and that the mosaics were extensively documented by the Dumbarton Oaks publication as belonging to the Kanakaria Church. While the UNESCO Convention seems to contemplate primarily measures to be implemented by the executive branch of a government through its import and export rules and policies, the judicial branch should certainly attempt to reflect in its decisionmaking the spirit as well as the letter of an international agreement to which the United States is a party.

The UNESCO Convention, although ratified by Congress in 1972, was not formally implemented in the United States until the

---

3. For more detailed discussion of this two hundred year development, see Bassiouni, *Reflections on Criminal Jurisdiction in International Protection of Cultural Property,* 10 Syracuse J. of Int'l Law and Commerce 281, 287–97 (1983).

4. For a more detailed discussion of the UNESCO Convention, see Jora, *The Illicit Movement of Art and Artifact: How Long Will the Art Market Continue to Benefit from Ineffective Laws Governing Cultural Property?* 13 Brooklyn J. Int'l L. 55, 62–66 (1987), and for discussion of the United States' implementation of the UNESCO Convention, see Note, *Harmonious Meeting: the McClain Decision and the Cultural Property Implementation Act,* 19 Cornell Int'l L.J. 311, 318–21 (1986).

enactment of the Cultural Property Implementation Act in 1983. The Cultural Property Implementation Act, 19 U.S.C. §§ 2601–2613, focuses primarily on implementation of Articles 7(b) and 9 of the UNESCO Convention, which call for concerted action among nations to prevent trade in specific items of cultural property in emergency situations. The delay in the enactment of the Cultural Property Implementation Act apparently was caused, in part, by pressure from art dealers and traders, who argued that if the United States undertook unilateral import controls, illegal cultural property would simply be sold to those art market countries lacking similar import controls. In fact, the Cultural Property Implementation Act was perhaps finally enacted only because it was perceived as a restraint of sorts on certain Customs officers. These officials had deemed all archaeological materials that a foreign country had claimed were "stolen" to be subject to seizure under the National Stolen Property Act, 18 U.S.C. § 2311 *et seq.* (1934). The Cultural Property Implementation Act, therefore, emphasized the need for concerted action and, in particular, seemed to prefer action resulting from bilateral treaties between the United States and the affected source countries. Such treaties have now been put into effect with a few countries, including Mexico, Guatemala and Peru.

As indicated, the Cultural Property Implementation Act addresses primarily the question of import controls and, in section 2607, prohibits the importation into the United States of any "cultural property documented as appertaining to the inventory of a museum or religious or secular public monument or similar institution in any State Party which is stolen from such institution...." This section is not directly applicable here, first, because the mosaics were stolen after the effective date of the statute and, second, because the statute is directed at import controls rather than replevin suits. Nonetheless, the policy that the Act embodies is clear: at the very least, we should not sanction illegal traffic in stolen cultural property that is clearly documented as belonging to a public or religious institution. This is particularly true where this sort of property is "important to the cultural heritage of a people because of its distinctive characteristics, comparative rarity, or its contribution to the knowledge of the origins, development, or history of that people." 19 U.S.C. § 2601(2)(C)(ii)(II).

Focusing on a relatively short segment of what might otherwise be considered its "history," the United States chooses sometimes to ignore the ancient cultural heritage of the land which it now occupies. But a short cultural memory is not an adequate justification for participating in the plunder of the cherished antiquities that play important roles in the histories of foreign lands. The UNESCO Convention and the Cultural Property Implementation Act constitute an effort to instill respect for the cultural property and heritage of all peoples. The mosaics before us are of great intrinsic beauty. They are the virtually unique remnants of an earlier artistic period and should be returned to their homeland and their rightful owner. This is the case not only because the mosaics belong there, but as a reminder that greed and callous disregard for the property, history and culture of others cannot be countenanced by the world community or by this court.